55¢

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1329 | **DATE** | 5/21/2003 |
| **CASE TITLE** | Patricia A. Luna vs. United States of America | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion And Order. The court concludes that Defendant is not shielded from liability under the Federal Torts Claims Act as a "borrowing employer", but because Plaintiff has not met her burden of demonstrating that Defendant's negligence caused her injuries, the court finds in favor of the United States on the merits. Judgment is entered in favor of the United States on the merits and against the Plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | | **Document Number** |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | date docketed | | 33 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| ✓ | Copy to judge/magistrate judge. | | 5/21/2003 | | |
| | | | date mailed notice | | |
| ETV | courtroom deputy's initials | FILED FOR DOCKETING | ETV | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

PATRICIA A. LUNA,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )     No. 00 C 1329
                                     )
UNITED STATES OF AMERICA,            )     Judge Rebecca R. Pallmeyer
Department of the Navy,              )
                                     )
          Defendant.                 )

## MEMORANDUM OPINION AND ORDER

Plaintiff Patricia A. Luna has filed this action against Defendant United States of America, Department of the Navy, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2761 *et seq.* Plaintiff was injured while performing professional services at the U.S. Navy's Service School Command ("SSC") as an employee of Resource Consultants, Inc. ("RCI"), a contractor for the Navy, and has already received workers' compensation for her injuries. In this action, Plaintiff seeks to recover damages from the United States.

Most private employers operating in Illinois contribute to the state's workers' compensation fund. Workers' compensation entitles an employee who has been injured in the course of her employment to an award of benefits without regard to fault. In exchange, the employee forfeits the right to recover tort damages for the same injury; the award constitutes that employee's exclusive remedy. Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/1; *Belluomini v. United States*, 64 F.3d 299, 302 (7th Cir. 1995). Of particular importance in this case, the scope of the IWCA extends to the scenario in which one employer loans an employee to another employer. 820 ILCS 305/1(a)(4). If the employee is injured while in the employ of the borrowing employer, the loaning employer and the borrowing employer are jointly and severally liable for any benefits to which the employee is entitled. *Id.* And both employers share the immunity from tort liability conferred by the act. *Belluomini*, 64 F.3d at 302 (citations omitted). As the court discusses in

greater depth below, under Illinois law, the determination of whether a borrowed employee-employer relationship exists depends on the amount of control the alleged borrowing employer has over the employee. *Crespo v. Weber Stephen Prods. Co.,* 275 Ill.App.3d 638, 641, 656 N.E.2d 154, 156 (1st Dist. 1995).

In an earlier opinion in this case, this court concluded that there was a dispute of fact as to whether Defendant was a "borrowing employer," and thus protected from this FTCA lawsuit by the exclusive remedy provision of the IWCA, 820 ILCS 305/1 *et seq. Luna v. United States,* No. 00 C 1329, 2001 WL 664445 (N.D. Ill. June 13, 2001). Subsequently, the parties have submitted numerous depositions and the court held a bench trial on February 21, 2003. For the reasons explained here, the court finds no evidence that Defendant acted negligently, and therefore enters judgment in favor of the United States on the merits. Because the parties focused nearly all of their attention on Defendant's status as a "borrowing employer," the court addresses the evidence on this issue, as well, and concludes, as explained here, that the government does not qualify as a borrowing employer under the IWCA.

## FACTUAL BACKGROUND

RCI is an international company with more than 20 years of experience in providing administrative, personnel, and training support to the Navy and other Department of Defense offices. (RCI Proposal, Gov't Ex. A-2.) All of RCI's work is obtained through contracts, and most of its contracts are with the United States Government. (Witt Dep., at 16, 20.) Among other things, RCI has designed and developed curricula, designed and presented courses of instruction, provided training to military and Department of Defense civilian personnel, and operated schools. (RCI Proposal, Gov't Ex. A-2.) RCI also provides outplacement assistance to people who are exiting the military, for example, by assisting workers with writing resumes, interviewing, and negotiating. (Witt Dep., at 18.)

2

**Contract Between RCI and the Navy**

On March 31, 1997, RCI entered into a five-year contract with Defendant under which RCI employees provided administrative services in support of students and staff at the Service School Command (SSC) at the Naval Training Center in Great Lakes, Illinois. (Gumbert Dep., at 19.) Jill Wells, a government witness, explained that the parties understood that RCI employees would perform functions formerly carried out by employees ("billets") of the Navy. (Wells Dep., at 18.)

Section C-1 of the contract entered into by RCI and Defendant in 1997 stated that:

> The services rendered by the Contractor are rendered in the capacity as an independent, non-personal service Contractor. The Government may evaluate the quality of administrative services for purposes of contract inspection and acceptance. The Government retains no direct control over the administrative services rendered, and the Contractor shall be solely responsible for any and all liability caused by the acts or omissions of its agents or employees. The Contractor shall not in any manner represent or infer that it is an instrumentality or agent of the United States Government.

(Contract Section C-1, §1.3.2, Gov't Ex. A-3.)

According to Elizabeth Gumbert, a government employee and one of the two administrators assigned to the RCI contract, RCI's contract with Defendant was a "firm, fixed price contract." (Gumbert Dep., at 20-22.) Jill Wells, the other administrator for the RCI contract, explained that this means that RCI proposed a price for each of the services that were identified in the government's bid schedule. Once the government accepted RCI's proposal, RCI was required to perform at the price quoted; there were no adjustments to the quoted price. (Wells Dep., at 46-47.) Theodore ("Ted") Witt, a former Navy officer who began working for RCI in 1995 and who served as the manager for the contract, explained that government managers told RCI staff what jobs needed to be done and gave them guidance on how to do them, but then RCI came up with the number of people necessary to get the work done. The initial contract in 1997 called for 88 RCI employees to work at the Naval base; it was RCI who proposed that number, which government representatives accepted. (Witt Dep., at 26.)

As noted, the RCI contract characterized RCI as a "non-personal service" provider.

3

According to George Troendle, one of RCI's founding partners, the term "non-personal service contract" typically means that the government selects the company (here, RCI) and the company chooses the people to carry out the required functions. (Troendle Dep., at 42.) Under such a contract, "an independent company . . . take[s] responsibility for the sourcing and management and care and feeding and career development for those employees." (Id., at 56.) Under the contract at issue here, RCI agreed "to handle all of the management of their employees, all of the details of their employees' work, all of the scope of their employees' work, all of the supervision of their employees, all of the hiring and the firing and the pay rates, as long as they went above the minimum[1] with the government, just expecting that the contract results would be fulfilled." (Id., at 58.) Jill Wells acknowledged, however, that a personal services contractor gives the appearance that its employees are government employees because "they're right in there, they're taking direction from the Government, whereas nonpersonal there's no direction or supervision involved." (Wells Dep., at 40.)

The contract describes the duties to be performed by RCI employees in a 25-page Statement of Work. The responsibilities include: control and management of hazardous materials, administrative support for students and staff, inventory of supplies at the base, re-supply of needed materials at the base, and student housing assistance. (Contract § C-5, Gov't Ex. A-3.) With regard to the student/staff support function, for example, the contract requires, among other things, that "[t]he Contractor personnel shall provide liaison between the student and/or staff member and PSD [Personnel Support Detachment] regarding personnel information, military pay and allowances and other personnel support required for the accomplishment of SERVSCOLCOM mission. This function is conducted continuously on a daily basis via personal visits to PSD, telephone and electronic media." (Contract § 5.3.5, Gov't Ex. A-3.) This description is typical; the contract

---

[1]     The Department of Labor's Wage and Hour Division set the minimum wage requirements for all federal agencies, and RCI was bound by those rates. (See, e.g., Wage Determination No. 94-2167, Gov't Ex. A-1.)

4

carefully delineated all of the tasks required and the frequency with which they must be carried out, but did not dictate precisely how the tasks are to be accomplished.    The contract also listed the minimum qualifications for the various jobs titles, such as the "student/staff support function." (Contract Attachment 8, Gov't Ex. A-3.)

The contract provided the government personnel who had been performing the services contemplated by the contract would remain on-site for 30 days after RCI's commencement of performance under the contract (which the court understands was on or after March 31, 1997, the date the contract was awarded to RCI) in order to ensure a smooth transition to RCI personnel, to turn over files, documents and publications, and to respond to inquiries. (*Id.*, §1.11.) Brian Johnson, Vice-President of RCI, explained that he understood the term "independent non-personal contract" to mean that the government did not specify nor care how the services were to be provided, as long as they were done as required. As a result, RCI did not replace every former Naval employee with an RCI employee; instead, it eliminated some jobs that were not deemed necessary to accomplish the requirements of the contract. (Johnson Dep., at 28, 56-57.) Under the contract, RCI provided a site manager and assistant site manager to oversee the other RCI employees at the SSC. (Wells Dep., at 20.) RCI also provided supervisors in charge of each of the training schools at the base (e.g. Diesel School, Engineering Corps School, Gun School, Advance Electric Training Course, Seamen Apprenticeship Training Division ("Seamen ATD"), Communications Navigation Division), as well as employees working under these supervisors to provide administrative services. (*Id.*, at 21-24.) Although the record is unclear on this point, the court understands that the positions described above were previously held by employees of the Navy. (*Id.*, at 20-24.)

The United States Department of Labor established all of the job qualifications and classifications and set the minimum wage RCI employees were required to receive, and set the dress code for RCI employees working under the contract. (Anastasi Dep., at 18.) RCI supervisors

5

were responsible, however, for ensuring that its employees met the requirements, and RCI had responsibility for their supervision, oversight, and evaluation. (Anastasi Dep., at 18.) Witt stated that although he did not believe they were required to do so under the contract, RCI supervisors instructed their employees to comport themselves in a manner appropriate for working on a military base. (Witt Dep., at 97-98.)

To ease the difficulty of training them for work at the Naval base, most of the employees recruited by RCI to work on the contract already had some military experience. (Witt. Dep., at 23.) Of the RCI employees hired initially under this contract, 90 percent received at least some training directly from the government, for example, on-the-job training during the 30-day overlap between the outgoing Navy billets and the incoming RCI employees; government training of command financial specialists;[2] and three days of government training for certain RCI employees on use of the military message system. (Witt Dep., at 23-25.) Wells testified that the hazardous material technicians hired by RCI also received training from the Navy. Wells explained that remaining employees were more or less trained by RCI, with the exception of a one-week financial counseling course sponsored by the government and given to some RCI employees (she did not explain who receives such training and when). (Wells Dep., at 52.)

Under the contract, the government agreed to provide RCI with office space and facilities, parking spaces, telephone services, utilities, office supplies, computer equipment, computer software, four government vehicles, and other equipment. (Contract Section C-3, § 3.1, Gov't Ex. A-3.) The government also agreed to provide routine custodial services. (Id. § 3.10.1.) The contract provided that the government would provide emergency medical service for any injuries on the job, but RCI was require to reimburse the government and to move any injured employee to a civilian hospital as soon as possible. (Wells Dep., at 47-48.) RCI also provided many of its

---

[2]    Command financial specialist training consists of teaching employees how to counsel students in financial matters, and how to construct a budget. (Witt Dep., at 24.)

own office supplies to carry out its work under the contract. (Witt Dep., at 73.)

The contract provided that government safety officials, environmental engineers, fire inspectors, security officers and other agencies were allowed to conduct surveys, studies and inspections of operations and facilities at all reasonable times. Other government personnel, such as Service School Command management and Inspector General or higher headquarters staff were also authorized to observe contractor operations, but the contract further stated that "these personnel will not interfere with Contractor performance and will refer all documents concerning the Contractor's operation to the COR [Contracting Officer's Representative]." (*Id.* §1.12.)

The contract contemplated that the COR (the government's point of contact with RCI) would monitor the contractor's performance and progress, but would not directly supervise the work. Specifically, the Contract Administration Plan (a section of the larger contract) explained:

> In performing contract surveillance duties, the COR should exercise extreme care to ensure that he/she does not cross the line of personal services. The COR must be able to distinguish between surveillance (which is proper and necessary) and supervision (which is not permitted). Surveillance becomes supervision when you go beyond enforcing the terms of the contract. If the contractor is directed to perform the contract services in a specific manner, the line is being crossed. In such a situation, the COR's actions would be equivalent to using the contractor's personnel as if they were government employees and would constitute transforming the contract into one for personal services.

(Contract, § b(1), Gov't Ex. A-3.)

According to Elizabeth Gumbert, one of the two government administrators assigned to the RCI contract, the government did not have the right to discipline contractors. (Gumbert Dep., at 28-29.) The contract stated that the "government retains no direct control over administrative services rendered and the contractor shall be solely responsible for any and all liability caused by the acts or omissions of its agents or employees." (Gov't Ex. A-3, § 3.2.) Ted Witt interprets this language to mean that the government had no authority under the contract to fire, hire, or deny employees' vacation requests. (Witt Dep., at 99.) Witt acknowledged, however, that if he received a complaint about an RCI employee from a government official, he would likely have taken steps

7

to fire that person. (Witt Dep., at 36.)

Robert Stoneking, who was a Divisional Functional Supervisor at RCI for almost five years, explained that Naval Training Advisors ("TAs"), evaluated RCI's performance under the contract on a quarterly basis. If a problem arose with an RCI employee, for example, the TA reported the problem to Stoneking or his equivalent for resolution. (*Id.*) In fact, according to Witt, the TAs were directly involved in monitoring how RCI employees did their jobs. TAs were, in Witt's words, "in theory" confined to communicating with supervisory RCI staff, but in reality in contact with people lower on the chain of command. (Witt Dep., at 37.) Witt does not consider himself to be an independent contractor. (Witt Dep., at 90.) Jill Wells, in contrast, testified that while TAs assisted in the surveillance of RCI personnel and served as the Navy's point of contact in answering RCI's questions, they were not allowed to give technical direction to RCI employees. (Wells Dep., at 32.) Wells explained that because the contract was for "non-personal" services, this meant that no direction was to be given to the contractor. (Wells Dep., at 39.) The court has been given no reason to weigh Wells' testimony over Witt's, and therefore concludes that the witnesses' conflicting opinions do not support a firm conclusion on this issue.

**Plaintiff Luna's Employment**

Plaintiff Patricia Luna was born on July 7, 1967. She moved from North Carolina to Great Lakes, Illinois, in 1997 when her husband was assigned here by the Navy. (Testimony of Luna.) Plaintiff is a former RCI employee, who at all times relevant to this case, worked in the student staff office as a Senior Administrative Assistant in the Seamen Apprenticeship Training Division ("ATD"). (Wells Dep., at 25, 26.) She and the approximately five other RCI employees who worked in the Seamen ATD performed the various student/staff support functions set forth in Paragraphs 5.3.1 to 5.3.27 of the contract, which included assisting incoming Naval recruits in filling out forms and making travel arrangements for those students scheduled to leave the SSC for another duty station. (Wells Dep., at 25.) Plaintiff's job title was personnel liaison representative ("PLR").

8

(Stoneking Dep. at 11.) She acted as a liaison between the students and the personnel office, which was staffed by employees of the Defendant. (Wells Dep., at 27.) In this capacity, she provided administrative support to sailors, which included checking new sailors' service records for accuracy. (Anastasi Dep., at 13.)

When Plaintiff was hired, she was instructed that she would be an employee of RCI, not of the Defendant, and that her customer was the United States Government. (Witt Dep., at 79, 80.) Robert Stoneking, Plaintiff's direct supervisor, was directly responsible for her job performance, and explained that if he had found her work to be unsatisfactory, he would be the one to initiate action to have her terminated (RCI's project manager for the contract, Ted Witt, would make the final decision). (Stoneking Dep., at 6-7, 12.) Government employees had no right to fire her under the contract, although they were entitled to report complaints to Stoneking. (*Id.*, at 22.) Significantly, Plaintiff never received directions or supervision from any government officers during her tenure at Great Lakes. (Testimony of Luna.)

Plaintiff received one month of training when she started working at Great Lakes in 1997 (the record does not reveal the exact date). (Witt Dep., at 37.) Stoneking was responsible for training Plaintiff, although she also received some computer and financial counseling training from government employees on the base. (Stoneking Dep., at 23.) No one in Plaintiff's chain of command was a military employee, but Ted Witt testified, consistent with his description of supervision by TAs, that Naval personnel did have the right to tell Plaintiff how to do her job. (Witt Dep., at 36, 51.) For example, Naval personnel could order Plaintiff to change her work location, tell her to use different procedures in carrying out her duties, or instruct her to give students different information. (Witt Dep., at 53.) Ultimately, though, Witt acknowledged that it was RCI's responsibility to inspect Plaintiff's work and ensure compliance with the contract. (Witt Dep., at 64.) Witt stated that he "philosophically" considers himself to be a government employee. (Witt. Dep., at 41), but Stoneking testified that Plaintiff and other RCI employees were not considered

9

government employees.  (Stoneking Dep., at 28.)

**Plaintiff's Injury**

On December 23, 1997, the day of her injury, Plaintiff was assigned to deliver a "departure brief," a speech to a group of Naval recruits scheduled to leave the training center.  (Stoneking Dep., at 17.)  Normally these briefings take place in a classroom, but because a large number of recruits were expected to attend the session that day (200 as opposed to the usual 50), Defendant changed the location from the classroom to the training area, or "trainer."[3]  Plaintiff had never given a brief in the training area before.  (Stoneking Dep., at 18.)  She addressed the recruits from a platform 36 inches above the floor, constructed to resemble the deck of a Navy ship.  At the edge of the "ship" was the "water," also described as a "moat."  (Wells Dep., at 57.)  Plaintiff described the room as filled with students who were sitting on the deck of the ship, leaving her little space to walk.  (Testimony of Luna.)  She made her way to the back of the room, but during the first few moments of her talk, Plaintiff stepped backward and fell off the platform into the moat.  (Testimony of Luna.)

In severe pain, Plaintiff was driven in an ambulance to the Naval emergency room, where she was X-rayed, fitted with a leg immobilizer, and provided with crutches.  (Testimony of Luna.)  The treating physician (unnamed in this record) informed Plaintiff that he was not a specialist and recommended that she return the following Monday (December 29, 1997) for further examination.  (Testimony of Luna.)  The doctor did not recommend that Plaintiff go home for the remainder of the day, and she did return to work, spending the rest of the day at her desk, in severe pain.  (Id.)  The following day, Christmas Eve, Plaintiff returned to work, in the immobilizer and on crutches, and still in severe pain.  Plaintiff does not recall whether she worked a full day that day, but she testified that she spent Christmas and the days immediately following mostly in bed, unable to engage in most activities.  (Id.)

---

[3]     It is unclear who specifically ordered the move to the training area.

10

On Monday, December 29, she went back to the hospital and saw another doctor (also unidentified) who referred her to Dr. Grossman, an orthopedic specialist. Dr. Grossman did another X-ray and recommended that Plaintiff either undergo surgery or try physical therapy. Prompted by her husband, Plaintiff underwent an MRI (the date of the MRI is not in the record), which showed a torn anterior cruciate caused by a blow or injury to the side of her knee, as well as a meniscus tear and a cracked patella. Plaintiff followed Dr. Grossman's recommendation that she remain home for a week and elected to begin physical therapy. (Testimony of Luna.)

At some point after her consultation with Dr. Grossman, a Naval doctor (Plaintiff was entitled to treatment from Naval doctors because of her husband's status in the military), Plaintiff decided to see a private doctor about her injuries as well. On March 6, 1998, Dr. Fetter of Gurnee, Illinois, an orthopedic surgeon, performed surgery to repair the damage to Plaintiff's knee. (Testimony of Luna.) Plaintiff was home from work for at least two weeks following her surgery. (Testimony of Luna.) She continued thereafter with physical therapy and saw Dr. Fetter regularly through August of 1998. She was also instructed to do leg exercises at home, and was given a brace to help stabilize her knee. (Id.) Plaintiff has two scars on her right knee, and Dr. Fetter has warned her that she is a likely candidate for arthritis later in her life. (Testimony of Luna.) Although Plaintiff is still able to do most activities (for example, she enjoys line dancing and she cleans houses professionally), she still experiences frequent swelling and pain, and is unable to play on a softball team as she once did. (Testimony of Luna.)

Stoneking testified that before the incident it never occurred to him that there should be a rope line at the edge of the platform to prevent someone from stepping off of it. He stated, "I thought anybody with any common sense walks out there and sees that drop-off, they know about it. And if they're anywhere close, they're not going to, even though there is no line, they're not going to back off and fall in there. Any reasonable – but I can't say for her, what she was thinking of. She got so wrapped up, involved in her thing that she just – and she told me later, 'they all said,

11

"Mrs. Luna, look out." ' " (Stoneking Dep., at 18-19.)

Stoneking testified, further, that had there been a rope line at the edge of the platform to prevent people from stepping off, the accident might still have occurred if someone stepped backward, as Plaintiff did, without looking. (*Id.*, at 19.) Real Naval ships do not have a warning line at their edge, either, Stoneking explained, although some piers have a banister-type boundary to prevent people from falling over. (*Id.*)

In December 1998, Plaintiff settled a workers' compensation claim for $20,706.40. On March 3, 2000, Plaintiff brought this suit under the Federal Tort Claims Act, requesting compensation in the amount of $150,000.00 for the injuries she sustained during the fall. (Trial Memo at 1; Complaint ¶ 10.)

## DISCUSSION

As noted earlier, this case ultimately turns on the issue of Defendant's negligence. In litigating this case, however, the parties devoted nearly all of their attention to Defendant's "borrowing employer" defense to liability. Because this issue was thoroughly explored, the court analyzes the matter here, recognizing that much of what follows may be characterized as *dicta*.

## I.    Whether Defendant Qualifies as a Borrowing Employer Under the IWCA

Under Illinois law, an individual who is injured in the course of her employment is entitled to obtain an award of benefits without regard to fault. In exchange for this benefit, the employee accepts the IWCA as her exclusive remedy and forfeits her right to recover tort damages for the same injury from her employer. *Belluomini v. United States*, 64 F.3d 299, 302 (7th Cir. 1995).

Section 305/5(a) of the IWCA states:

> No common law or statutory right to recover damages from the employer, his insurer, his broker, any service organization retained by the employer, his insurer or his broker to provide safety service, advice or recommendations for the employer or the agents or employees of any of them for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act . . . .

820 ILCS 305/5(a). The IWCA further provides that "where one employer loans an employee to another employer and the employee then gets injured, the loaning employer and the borrowing employer are jointly and severally liable for any benefits which the employee is due." *Wilhite v. Illinois Power Co.*, 139 F.Supp.2d 971, 974 (C.D. Ill. 2001), citing 820 ILCS 305/1(a)(4). As the court discussed above, the threshold issue in the case is whether Defendant qualifies as a "borrowing employer" and can thus seek refuge in the exclusive remedy provision of the IWCA.

In support of its argument on this issue, Defendant relies heavily on the Seventh Circuit's decision in *Belluomini*. *Belluomini* concerned a tragic event in which the plaintiff's husband, a Court Security Officer ("CSO") was killed while on duty in the federal courthouse here. At the time of his death, Officer Belluomini was employed by the General Security Services Corporation ("GSSC"), a private entity hired by the United States Marshals Service to assist in protecting the federal judiciary. *Id* at 301. The evidence showed that at least 80 percent of GSSC's business consisted of supplying CSOs to the government. *Id.* at 303. Pursuant to its contract with the Marshals Service, GSSC was obligated to pay CSOs their wages and provide workers' compensation for them. *Id.* After her husband's death, Officer Belluomini's widow settled a workers' compensation claim with GSSC, and then sought damages from the United States under the FTCA.

The issue in the case was whether Officer Belluomini qualified as a loaned employee pursuant to the IWCA, which would render the United States immune from the lawsuit. In holding that the plaintiff had no further recourse against the United States, the court in *Belluomini* discussed two methods for determining whether the United States Marshals could be considered a borrowing employer under the IWCA. *Id.* at 302. One of the tests centered on the following language in the IWCA:

> Where an employer operating under and subject to the provisions of this Act loans an employee to another such employer and such loaned employee sustains a compensable accidental injury in the employment of such borrowing employer and where such borrowing employees does not provide or pay the benefits or payments due such injured employee, such loaning employer is liable to provide or pay all benefits or payments due such employee under this Act and as to such employee

13

> the liability of such loaning and borrowing employers is joint and several . . . . An employer whose business or enterprise or a substantial part thereof consists of hiring, procuring or furnishing employees to or for other employers operating under and subject to the provisions of this Act for the performance of the work of such other employers and who pays such employees their salary or wages notwithstanding that they are doing the work of such other employers shall be deemed a loaning employer within the meaning and provisions of this Section.

820 ILCS 305/1(a)(4). From this language, the *Belluomini* court concluded that if an entity qualifies as a "loaning employer" under Section 305/1(a)(4), then the entity to which it "loaned" an employee automatically becomes a "borrowing employer." The court then explained that if the defendant is not, by extension, deemed a "borrowing employer" under the IWCA, it may nevertheless rely on a second test as a defense. This second test "focuses on the extent of control which the alleged borrowing employer has over the employee and inquires as to whether a contract existed between the employee and the borrowing employer." *Belluomini*, 64 F.3d at 302. Applying the first test, the *Belluomini* court found that GSSC was a "loaning employer" under the language of the IWCA, and therefore concluded that the Marshals Service was consequently a "borrowing employer."

Illinois Appellate Court cases decided since *Belluomini* have clarified that the question of whether an entity qualifies as a borrowing employer is one of fact, thereby requiring the court to employ only the second test identified in *Belluomini*, that is, the "control" test. *Luna v. United States*, 2001 WL 664445, citing *Chaney v. Yetter Mfg. Co.*, 315 Ill.App.3d 823, 734 N.E.2d 1028 (4th Dist. 2000) and *Crespo v. Weber Stephen Prods. Co.*, 275 Ill.App.3d 638, 656 N.E.2d 154 (1st Dist. 1995); *Luna v. United States*, 2001 WL 1512530 (N.D. Ill. Nov. 28, 2001.) Subsequent to this court's own earlier opinions in this case, the Third District of the Illinois Appellate Court decided *Lanphier v. Gilster-Mary Lee Corp.*, and held that a temporary worker's status as a loaned employee is a question of fact to be determined by the trier of fact. 327 Ill.App.3d 801, 802, 765 N.E.2d 493, 494 (3d Dist. 2002). Significantly, the court in *Lanphier* overruled its earlier ruling in *Wasielewski v. Havi Corp.*, 188 Ill.App.3d 340, 544 N.E.2d 116 (3d Dist. 1989), which had embraced the statutory test applied in *Belluomini*, and adopted the reasoning in *Crespo* and

14

*Chaney.* 327 Ill.App.3d at 802, 804, 765 N.E.2d at 494, 495-96. Based on the foregoing, the court concludes that it may safely predict this is the course the Illinois Supreme Court would endorse, were the issue presented to it.

This test "focuses on the extent of control which the alleged borrowing employer has over the employee and inquires as to whether a contract existed between the employee and the borrowing employer." *Belluomini,* 64 F.3d at 302. The primary factor is the "right to control." *See Crespo,* 275 Ill.App.3d at 641, 656 N.E.2d at 156. Factors to consider when determining control are: the character of the supervision of the work done, the direction of the employee, the manner of hiring, the right to discharge, and the mode of payment. *See Chaney,* 315 Ill.App.3d at 827, 734 N.E.2d at 1031 (citing *Freeman v. Augustine's, Inc.,* 46 Ill.App.3d 230, 234, 360 N.E.2d 1245, 1247-48 (5th Dist. 1977)). The court shall address each factor as it relates to Plaintiff's employment.

### A.    Character of the Supervision of the Work Done

The RCI-Navy contract called for RCI employees to serve as supervisors of its lower level employees at the Great Lakes Naval training center. Plaintiff's direct supervisor was Robert Stoneking. Ted Witt testified that no one in Plaintiff's direct chain of command was a government employee. Plaintiff never reported to anyone other than Stoneking, and he was the person she consulted if she had a problem or question about work. (Testimony of Luna.) Although there is evidence that the TAs played a role in monitoring RCI employees' work under the contract, there is no evidence that any TA ever specifically instructed Plaintiff on how to perform her job, or that any TA ever spoke to Stoneking about her performance.

Wells described the contract as one in which the government performed little supervision. (Wells Dep., at 40.) The contract itself provided that in monitoring RCI's progress, government inspectors "must be able to distinguish between surveillance (which is proper and necessary) and supervision (which is not permitted)," and specifically prohibited the government from directing RCI

to "perform the contract services in a specific manner" because doing so would constitute using RCI's employees as if they were government employees, a result to be avoided. (Contract Administration Plan Section b(1), Gov't Ex. A-3.) These circumstances are in contrast to *Chaney*, for example, where the plaintiff was employed by a temporary work agency to work for the defendant, but defendant's employees supervised her work and directed all of her work activities. The *Chaney* court held that defendant was a borrowing employer, entitled to the protection of the exclusive remedy provision of the IWCA. *Chaney*, 315 Ill.App.3d at 828-29, 734 N.E.2d at 1032. And in *Belluomini*, it was the Marshals Service, not GSSC, that supervised Officer Belluomini's daily activities. 64 F.3d at 304. Here, it is true that the contract specifies the functions that Plaintiff was to carry out, but Plaintiff was instructed as to those functions and supervised by other RCI employees.

### B.    Direction of the Employee

Consistent with the contract provisions discussed above, there is no evidence in the record that Plaintiff was ever directed to follow particular methods in performing her work by any of Defendant's employees. Although the list of required tasks in the contract was quite lengthy, the government did not delineate the manner or method by which the work was to be performed. Rather, the evidence shows that Plaintiff was trained to do her job and received ongoing support and guidance from Stoneking. Again, this differs from the facts in *Chaney*, where defendant's staff gave plaintiff instruction on how to do her job the day she arrived and thereafter reviewed all of her new and different assignments from defendant's employees. *Chaney*, 315 Ill.App.3d at 829, 734 N.E.2d at 1032. There is no evidence in this case of any significant changes on Plaintiff's job function, nor any evidence that government employees ever told her to take on new or different tasks. The direction Plaintiff received, she received from RCI.

Ted Witt did testify that TAs played a significant role in the monitoring of RCI employees' work. Notably, however, neither Witt nor any other witness described any specific direction from

16

a TA to Plaintiff. Witt testified that in its request for bids, the government identified the jobs it wanted done and provided guidance on how they should be done, but RCI came up on its own with the number of people necessary to accomplish these tasks. (Witt Dep., at 31-32.) In addition to the provisions described above, other language of the contract reinforces the conclusion that Plaintiff was directed in her job responsibilities by fellow RCI employees. For example, the contract states that "[t]he Government retains no control over the administrative services rendered." (Contract, Section C-1, § 1.3.2, Gov't Ex. A-3.) In addition, several witnesses testified that the term "non-personal service" describes a contract in which little direction is given to the contractor once the parties have agreed to the contract terms.

## C. Manner of Hiring

Defendant emphasizes the fact that after being awarded the contract, RCI went out and hired the employees to work at the Naval base. The court does not agree that this demonstrates that the employees were under Defendant's control, rather than RCI's; there is nothing noteworthy about a business's need to hire staff in order to fulfill obligations under a new contract. RCI proposed and the government agreed that would hire 88 employees under the contract. (Witt Dep., at 33-34.) It is simply not surprising that RCI did not already have 88 employees in the Great Lakes area who were not otherwise occupied. As it is undisputed that RCI hired Plaintiff, this factor weighs in favor of Plaintiff's argument that RCI, not the United States, was her employer.

## D. Right to Discharge

This factor is more evenly balanced. It is undisputed that RCI was the entity that could ultimately fire Plaintiff or any of its employees at Great Lakes. (Witt Dep., at 36.) Some evidence also suggests, however, that if RCI supervisors received complaints about employees at the Naval base, they would take action, which might include firing the individuals. (*Id.*) There is little doubt that if the government expressed dissatisfaction with Plaintiff's work, she would have been fired by RCI. That said, it was RCI that had the actual responsibility and power to discharge employees.

17

Furthermore, RCI also apparently had the right to discharge workers of its own accord, without Defendant's recommendation, and could have fired employees who failed to satisfy RCI, even if the government were fully satisfied with those workers. The court concludes that this factor is basically a draw: it neither bolsters nor detracts from the government's argument that it was a borrowing employer under the contract. In any event, the facts of this case are weaker for the government than they were in *Belluomini*, where the Marshals retained the authority to discharge CSOs, 64 F.3d at 304, or in *Chaney*, where it was undisputed that defendant had the right to discharge plaintiff from service at its plant. 315 Ill.App.3d at 829, 734 N.E.2d at 1032.

### E.    Mode of payment

Plaintiff received her paycheck from RCI, not from the government. As the *Chaney* court noted, however, "it is well established that '[t]he mere fact that the employee does not receive his wages from the [borrowing] employer will not defeat the finding of a loaned-employee situation.'" *Chaney*, 315 Ill.App.3d at 829, 734 N.E.2d at 1032, quoting *A.J. Johnson Paving Co. v. Industrial Commission*, 82 Ill.2d 341, 349, 412 N.E.2d 477, 481 (1980). Therefore, the fact that Plaintiff was compensated by RCI is of little import in the analysis of whether Defendant controlled her work performance for purposes of the IWCA. *Id.*

### F.    Conclusion

Analysis of the five factors leads the court to conclude that Defendant does not qualify as a borrowing employee. Plaintiff was supervised by an RCI employee, she received most of her training from RCI, she was hired and paid by RCI, and only RCI had the power to fire her. True, the government exercised great control over RCI with respect to the contract as a whole, but the evidence shows Defendant had little to do with Plaintiff or the manner in which she carried out her job responsibilities.

The court also finds support for its conclusion in the language of the contract. The Statement of Work sets forth the duties of the RCI employees in some detail, but it also expresses

18

the parties' intention to keep the government out of the day-to-day activities of RCI employees. The contract does not contemplate any direct supervision of RCI employees by the government. To the contrary, the contract required that RCI "shall not in any manner represent or infer that it is an instrumentality or agent of the United States Government." (Contract Section C-1, § 1.3.2, Gov't Ex. A-2.) It provided, further, that government inspectors were not permitted to supervise RCI employees and that the government would have no control over RCI's administrative services. (Contract Administration Plan, § b(1), Gov't Ex. A-3.) This language defeats the notion that the government exercised sufficient control over Plaintiff to be considered a borrowing employer.

As for whether a contract or agreement of employment existed between Plaintiff and Defendant, Illinois courts agree that the employee's express or implied acquiescence is essential to a borrowed-or-loaned employee relationship. *Chaney,* 315 Ill.App.3d at 829, 734 N.E.2d at 1033. Although she was aware that her work was for the Navy, Plaintiff considered RCI to be her employer, and testified that she never agreed to be a government employee. (Testimony of Luna.) The court in *Crespo* noted that the plaintiff consented to work for the defendant by appearing at defendant's facility each day, 275 Ill.App.3d at 641-42, 656 N.E.2d at 156, an observation that can be made about Plaintiff here as well. In *Crespo,* however, there were no other employees of plaintiff's employer at defendant's work site, necessitating that plaintiff take direction from an employee of the defendant. *Id.* The court stated that "[i]mplied consent exists where the employee is aware that the borrowing employer 'is in charge' or generally controls the employee's performance." 275 Ill.App.3d at 641, 656 N.E.2d at 156. Here, Plaintiff was surrounded by and took direction only from fellow RCI employees. The fact that she knew her employer was under contract with the Navy does not support the conclusion that Plaintiff herself impliedly agreed to a loaned employee relationship.

## II.     Whether the Defendant Was Negligent

Having concluded that the Defendant is potentially liable under the FTCA, the court must

then decide whether Plaintiff has shown that her injury was caused by the Defendant's negligence. In their written submissions as well as during the court hearing of February 21, 2001, the parties barely touched on this issue. The Federal Tort Claims Act provides a remedy for personal injury caused by the negligent or wrongful act or omission of government employees while acting within the scope of employment. The government is liable in the same manner and to the same extent as a private individual in accordance with the law of the state where the cause arose. 28 U.S.C. §§ 1346(b), 2671, and 2674. The court here therefore considers Illinois law in assessing Defendant's liability.

Plaintiff claims that her knee injury was caused by Defendant's negligence. Her own supervisor, Robert Stoneking, observed during his deposition that he thought anyone with "common sense" would have seen the drop-off and been more careful. Plaintiff offered no evidence to dispute this statement, nor did she offer evidence that the Defendant owed her a duty to warn her not to step off the platform. In *Wotiz v. Gruny*, 281 Ill.App.3d 50, 52, 667 N.E.2d 102, 104 (5th Dist. 1996), plaintiff brought an action for injuries he suffered when he slipped on a laminate sink cut-out in defendant's flower bed. The plaintiff, who had entered the flower bed to retrieve some items that fell from defendant's mail box, admitted he had seen the sink cut-out but testified that he did not know the cut-out was resting on top of four terra cotta pillars because ivy covered the edges of the board. *Id.* at 51. The appellate court observed that "no one is expected to guard against harm from events which are not reasonably anticipated at all or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded." *Id.* at 52 (citations omitted). In determining the existence of an obligation to act reasonably for the protection of a plaintiff, the relevant factors include the foreseeability of injury, the likelihood of injury, the magnitude of the burden of guarding against such an injury, and the consequence of placing that burden on the defendant. *Id.*, citing *Swope v. Northern Illinois Gas Co.*, 251 Ill.App.3d 850, 853, 623 N.E.2d 841, 843 (3d Dist. 1993); *West v. Faurbo*, 66 Ill.App.3d 815, 819, 384 N.E.2d 457, 459 (2d Dist. 1978).

Addressing these factors in *Wotiz*, the appellate court affirmed a summary judgment in favor of plaintiff.

In *Ziemba v. Mierzwa*, similarly, the Illinois Supreme Court affirmed the dismissal of a suit brought by a bicyclist who was injured when the bike he was riding collided with a dump truck exiting a driveway owned by the defendant. 142 Ill.2d 42, 45, 566 N.E.2d 1365, 1366 (1991). Plaintiff claimed that defendant owed plaintiff a duty to exercise "reasonable care in the conduct of activities on his property, so as not to cause damage or injury to persons on the adjacent roadway." *Id.* at 46. The court stated that the imposition of a duty in the circumstances of *Ziemba* "would require defendant to 'guard against the negligence of others.' " *Id.* at 53. The law does not impose such a requirement.

Faced with evidence of Plaintiff's own carelessness, and following the reasoning of the Illinois Supreme Court in *Ziemba*, this court concludes she has not met her burden of proof. Plaintiff's own supervisor testified that he thought the drop-off from the deck was obvious. The court is unable to conclude that Defendant owed Plaintiff a duty to warn her about the edge of the platform. It seems more likely to the court that Plaintiff, caught up in her presentation and perhaps overwhelmed by the size of her audience, simply forgot about the edge of the platform and stepped back too far. Therefore the court finds the Defendant not liable for Plaintiff's unfortunate accident.

## CONCLUSION

For the following reasons, the court concludes that Defendant is not shielded from liability under the FTCA, but because Plaintiff has not met her burden of demonstrating that Defendant's negligence caused her injuries, the court finds in favor of the United States on the merits.

ENTER:

Dated: May 21, 2003

REBECCA R. PALLMEYER
United States District Judge

21